T.C. Memo. 2013-203

UNITED STATES TAX COURT

STANLEY L. ALEXANDER AND RUTH A. ALEXANDER,
ET AL.,[1] Petitioners <u>v</u>. COMMISSIONER OF INTERNAL
REVENUE, Respondent

Docket Nos.  7907-06, 7908-06,          Filed August 29, 2013.
             7909-06, 7910-06,
             14047-07.

<u>David C. Greer</u> and <u>Robert H. Hishon</u>, for petitioners.

<u>Richard J. Hassebrock</u>, <u>Timothy S. Sinnott</u>, <u>David S. Weiner</u>, <u>Abigail</u>

<u>Raines</u>, and <u>Archana Ravindranath</u>, for respondent.

---

[1]Cases of the following petitioners are consolidated herewith:   Ruth A. Alexander, docket No. 7908-06; Stanley L. Alexander, docket No. 7909-06; Stanley L. Alexander, docket No. 7910-06; and Fountain Skin Care, Cosmetic, Plastic & Reconstructive Surgery, Inc., docket No. 14047-07.

[*2]                         CONTENTS

FINDINGS OF FACT. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

1.  Dr. and Mrs. Stanley Alexander. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

2.  Fountain Skin Care, Cosmetic, Plastic & Reconstructive Surgery, Inc.. . . . . . 14

3.  Stanley L. Alexander, M.D., Inc.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

4.  Anthony Kritt. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

5.  The Cincinnati Vein Clinic & the Midwest Vein Center.. . . . . . . . . . . . . . . . 18

6.  Kenneth Reiserer. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

7.  Galen Co./Da Vinci Group. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

8.  Offshore Employee Leasing Transaction. . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

9.  Nationwide Executive Staff Leasing, Inc.. . . . . . . . . . . . . . . . . . . . . . . . . . . 23

10.  Professional Leasing Services, Inc.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

11.  Montrain Services, Inc.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

12.  International Advisory Services, LLC. . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27

13.  Rosmol. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28

14.  Ruritania. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28

15.  London & Capital. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29

16.  Associated Enterprises, Ltd.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29

17.  Blenheim Fiduciary Group Ltd./Elfin Trust Group. . . . . . . . . . . . . . . . . . . . 30

**[*3]** 18. Returns. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32

OPINION. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 33

I.  Burden of Proof. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 33

II.  Deficiencies of Dr. and Mrs. Alexander . . . . . . . . . . . . . . . . . . . . . . 34
    A.  Statute of Limitations . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 34
    B.  Underpayment of Wage Income to Dr. Alexander. . . . . . . . . . . . . . . . . 35
        1.  Constructive Receipt of Money Transferred Into the Deferred
           Compensation Plan. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 35
        2.  Sections 402(b)(1) and 83(a). . . . . . . . . . . . . . . . . . . . . . . . . 37
        3.  Economic Substance Doctrine. . . . . . . . . . . . . . . . . . . . . . . . . 37
    C.  Whether Dr. and Mrs. Alexander Are Entitled to Schedule F Farming
        Loss Deductions for 2001 and 2002. . . . . . . . . . . . . . . . . . . . . . . 39
        1.  Substantiation of Deductions. . . . . . . . . . . . . . . . . . . . . . . . . 39
        2.  Activity Engaged In for Profit . . . . . . . . . . . . . . . . . . . . . . . 40
    D.  Whether Dr. and Mrs. Alexander Are Entitled to Unsubstantiated
        Schedule A Mortgage Interest Deductions for 2001 and 2002. . . . . 40

III.  Penalties and Additions to Tax for Dr. and Mrs. Alexander. . . . . . . . . . . . . 41
    A.  Section 6663 Fraud Penalties for the Underpayments of Tax Associated
        With the OEL Transaction. . . . . . . . . . . . . . . . . . . . . . . . . . . . 41
        1.  Underpayment of Tax. . . . . . . . . . . . . . . . . . . . . . . . . . . . . 41
        2.  Fraudulent Intent. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 42
            a.  Analysis of Fraudulent Intent. . . . . . . . . . . . . . . . . . 43
            b.  Badges of Fraud. . . . . . . . . . . . . . . . . . . . . . . . . . . . 45
                i.  Consistent Pattern of Underreporting. . . . . . . . . . . 46
                ii.  Lack of Credibility of the Taxpayer's Testimony. . 46
                iii.  Concealment of Income or Assets . . . . . . . . . . . . 47
                iv.  Dr. and Mrs. Alexander's Failure to Maintain
                Adequate Records Pertaining to Their Participation in
                the OEL Transaction and To Fully Cooperate in the
                Examination of Their Returns or in the Litigation. . . . 48
                v.  Failure To File a Return for 2003. . . . . . . . . . . . . 48

**[\*4]**

       vi. Dr. and Mrs. Alexander's Attempts at Distancing Themselves From the OEL Transaction. . . . . . . . . 49

   3. Conclusion. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 50

  B. Section 6662(a) Penalty for Underpayment of Tax. . . . . . . . . . . . . . . 50

   1. Substantial Understatement . . . . . . . . . . . . . . . . . . . . . . . . . . . 51

   2. Reasonable Cause Under Section 6664. . . . . . . . . . . . . . . . . . . . 51

  C. Section 6651(f) Fraudulent Failure To File Addition to Tax for 2003. . 54

  D. Section 6651(a)(2) and 6654 Additions to Tax for 2003 . . . . . . . . . . 55

   1. Section 6651(a)(2). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 55

   2. Section 6654. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 56

  E. Section 6651(a)(1) Failure To File Addition to Tax for 2002 and 2003. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 57

IV. Whether Mrs. Alexander Is Entitled to Innocent Spouse Relief Under Section 6015. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 58

V. Fountain's Deficiencies. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 64

  A. Dr. Alexander Was an Employee of Fountain During the OEL Transaction.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 64

   1. Employment Status. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 64

   2. Relief Under Section 530 . . . . . . . . . . . . . . . . . . . . . . . . . . . 66

  B. Fountain Is Liable for Employment Taxes With Respect to Dr. Alexander's Services During the Taxable Quarters Ended March 31, 1999, Through December 31, 2003. . . . . . . . . . . . . . . . 69

VI. Fountain's Penalties and Additions to Tax. . . . . . . . . . . . . . . . . . . . . . . . 69

  A. Fraud Penalty Under Section 6663. . . . . . . . . . . . . . . . . . . . . . . . . 69

  B. Penalty Under Section 6662. . . . . . . . . . . . . . . . . . . . . . . . . . . . . 70

  C. Section 6656 Penalty. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 70

**[\*5]**        MEMORANDUM FINDINGS OF FACT AND OPINION

GOEKE, <u>Judge</u>:  Dr. Stanley Alexander, a plastic surgeon, engaged in a transaction under which he used an offshore entity to purportedly lease back his services to his medical practice company in Ohio, ostensibly to facilitate a deferred retirement program in which a large part of his income rested untaxed. His participation in this plan is the principal reason for respondent's determinations of income tax deficiencies against Dr. Alexander and his wife, Ruth A. Alexander, determinations of deficiencies against his medical practice company for employment tax, and determinations against all consolidated petitioners for various additions to tax and penalties, including some for fraud.

Unless otherwise indicated, all section references are to the Internal Revenue Code in effect for the years in issue, and all Rule references are to the Tax Court Rules of Practice and Procedure

Respondent determined deficiencies in and additions to tax with respect to petitioners' Federal income tax as follows:

**[\*6]** <u>Docket No. 7907-06--Stanley L. Alexander & Ruth A. Alexander</u>

| | | Additions to tax/penalties | | |
|---|---|---|---|---|
| Year | Deficiency | Sec. 6651(a)(1) | Sec. 6662(a) | Sec. 6663 |
| 1999 | $152,835 | $30,469.60 | $30,587.00 | $114,626.25 |
| 2000 | 157,746 | 23,507.60 | 54,425.00 | 118,309.50 |
| 2001 | 221,104 | 54,425.00 | 44,220.80 | 165,828.00 |

<u>Docket No. 7908-06--Ruth A. Alexander</u>

| | | Additions to tax/penalties | | |
|---|---|---|---|---|
| Year | Deficiency | Sec. 6651(a)(1) | Sec. 6662(a) | Sec. 6663 |
| 2002 | $241,182 | $60,485.28 | $48,176.20 | $180,660.75 |

<u>Docket No. 7909-06--Stanley L. Alexander</u>

| | | Additions to tax/penalties | | |
|---|---|---|---|---|
| Year | Deficiency | Sec. 6651(a)(1) | Sec. 6662(a) | Sec. 6663 |
| 2002 | $241,182 | $60,485.28 | $48,176.20 | $180,660.75 |

<u>Docket No. 7910-06--Stanley L. Alexander</u>

| | | Additions to tax/penalties | | |
|---|---|---|---|---|
| Year | Deficiency | Sec. 6651(f) | Sec. 6651(a)(2) | Sec. 6664 |
| 2003 | $175,291 | $113,202.33 | ([1]) | $4,030.55 |

[1] The addition to tax under sec. 6651(a)(2) remains to be computed on 0.5% of the underpayment, per month, for a maximum of 50 months, not to exceed 50% in the aggregate.

**[\*7]** <u>Docket No. 14047-07--Fountain Skin Care, Cosmetic, Plastic &</u>
<u>Reconstructive Surgery, Inc.</u>

| Quarter ended | OASDI | Hospital insurance | Income tax withholding | Penalty sec. 6663(a) | Penalty sec. 6656 | Penalty sec. 6662(a) |
|---|---|---|---|---|---|---|
| 3/31/99 | $9,002.40 | $5,412.56 | $52,259.20 | $50,005.62 | $720.75 | -0- |
| 6/30/99 | 2,250.66 | 2,512.85 | 24,262.00 | 21,769.09 | 238.17 | -0- |
| 9/30/99 | 2,250.66 | 2,610.00 | 25,200.00 | 21,769.09 | 238.17 | -0- |
| 12/31/99 | 2,250.66 | 3,538.00 | 34,160.00 | 28,273.50 | 238.17 | -0- |
| 3/31/00 | 9,448.80 | 4,530.26 | 43,740.48 | 43,289.66 | 698.95 | $11,543.91 |
| 6/30/00 | 2,362.20 | 2,993.79 | 28,905.59 | 25,696.19 | 267.80 | 8,565.40 |
| 9/30/00 | 2,362.20 | 3,770.00 | 36,400.00 | 10,127.50 | 267.80 | 8,565.40 |
| 12/31/00 | 2,362.20 | 2,993.79 | 28,905.59 | 25,696.12 | 267.80 | 8,565.40 |
| 3/31/01 | 9,920.00 | 3,334.80 | 32,198.04 | 28,518.93 | 612.00 | -0- |
| 6/30/01 | 2,492.40 | 3,334.80 | 32,198.04 | 28,518.93 | 291.36 | -0- |
| 9/30/01 | 2,492.40 | 4,495.00 | 42,625.00 | 35,340.00 | 291.36 | -0- |
| 12/31/01 | 2,492.40 | 6,090.00 | 57,750.00 | 47,880.00 | 291.36 | -0- |
| 3/31/02 | 10,527.60 | 4,640.00 | 43,200.00 | 43,775.70 | 758.38 | -0- |
| 6/30/02 | 2,631.90 | 5,365.00 | 49,950.00 | 41,486.25 | 358.16 | -0- |
| 9/30/02 | 2,631.90 | 3,480.00 | 32,400.00 | 37,012.99 | 358.16 | -0- |
| 12/31/02 | 2,631.90 | 4,640.00 | 43,200.00 | 35,880.00 | 358.16 | -0- |
| 3/31/03 | 10,788.00 | 3,197.25 | 29,767.50 | 32,758.50 | 698.90 | 8,735.60 |
| 6/30/03 | 2,697.00 | 3,197.25 | 29,767.50 | 25,092.56 | 294.71 | 8,364.19 |
| 09/30/03 | 2,697.00 | 3,929.50 | 33,875.00 | 28,353.38 | 294.71 | 8,364.19 |
| 12/31/03 | 2,697.00 | 3,929.50 | 33,875.00 | 28,353.38 | 294.71 | 8,364.19 |

After concessions,[2] the issues for decision are:

---

[2]Petitioners have conceded the following issues:  (1) a charitable contribution deduction of $13,298 claimed by Dr. and Mrs. Alexander on

(continued...)

**[\*8]** (1) whether the statutory period for assessment of income tax has expired with respect to the taxable years 1999, 2000, and 2001 for Dr. and Mrs. Alexander. We hold that it has not;

---

[2](...continued)
Schedule A, Itemized Deductions, for the taxable year 2002 is disallowed; (2) a $57 loss reported on line 14 of the Alexanders' 2002 Form1040, U.S. Individual Income Tax Return, is disallowed; (3) a capital loss deduction of $3,000 on the Alexanders' 2000 and 2001 Schedules D, Capital Gain and Losses, is disallowed; (4) Dr. Alexander is liable for rental income of $52,080 reported on Schedule E, Supplemental Income and Loss, and allowed Schedule E expenses of $19,340 for the taxable year 2002; (5) Dr. Alexander is liable for a $56 penalty for an early withdrawal of savings for the taxable year 2002; (6) the Alexanders are allowed a Schedule E partnership loss related to Miami Valley Surgical of $41,120 and the inclusion of $59,333 in Schedule E partnership income for Mrs. Alexander related to the same partnership; (7) the determination to decrease $2,125 of income reported on Schedule C, Profit and Loss From Business, for the taxable year 2002; (8) the Alexanders are liable for income tax on $20,730 of unreported capital gain income they received during the taxable year 2000, and respondent properly disallowed a $732 capital loss deduction they claimed on their 2001 Federal income tax return; (9) the Alexanders are liable for income tax on $19,430 in additional wages paid by Fountain Skin Care, Cosmetic, Plastic & Reconstructive Surgery, Inc. (Fountain), to Ruth Alexander for the taxable year 2002; (10) Dr. and Mrs. Alexander are liable for additional self-employment tax of $67 and entitled to a corresponding self-employment tax deduction of $34 for the taxable year 2002; (11) the Alexanders are liable for additions to tax pursuant to sec. 6651(a)(1) for the years 1999-2001; (12) the Alexanders are liable for tax on the following additions to income: (a) $307 State income tax refund in 1999; (b) dividend income in the taxable years 2000, 2001, and 2002 of $15, $55, and $20 respectively; (c) interest income for the taxable years 2000 and 2001 of $336 and $49, respectively; (d) capital gain of $22,893 for the taxable year 2000; (e) $2,600 in farm income for the taxable year 2002; and (f) $100,000 in wage income received from Fountain but paid through Professional Leasing Services, Inc. (PLS), for the taxable year 2003. Petitioners also concede determinations respondent has made in their favor.

**[*9]**   (2)  whether Dr. and Mrs. Alexander are liable for income tax for Dr. Alexander's unreported wage income of $342,254.23, $354, 216, $433,500, $548,100, and $490,000 for the taxable years 1999, 2000, 2001, 2002, and 2003, respectively.  We hold that they are liable;

(3)  whether Dr. and Mrs. Alexander are entitled to deductions claimed for alleged farm-related expenses totaling $23,857 and $21,376 for the taxable years 2001 and 2002, respectively.  We hold that they are not;

(4)  whether Dr. and Mrs. Alexander are entitled to various deductions claimed on Schedule A, including mortgage interest for the years 2001 and 2002. We hold that they are not;

(5)  whether Dr. and Mrs. Alexander are liable for fraud penalties pursuant to section 6663 for the taxable years 1999 through 2002.  We hold that they are not;

(6)  whether Dr. and Mrs. Alexander are liable for accuracy-related penalties pursuant to section 6662(a) for the taxable years 1999, 2000, 2001, and 2002, and whether Fountain is liable for accuracy-related penalties pursuant to section 6662(a) for the taxable quarters at issue during 2000 and 2003.  We hold that they are liable;

**[*10]** (7) whether Anthony I. Kritt and Kenneth Reiserer are promoters, and if so, whether petitioners can rely in good faith on any tax advice provided by Messrs. Kritt and/or Reiserer in furtherance of a reasonable cause and good-faith defense to the penalties under sections 6663 and/or 6662(a). We hold that they were promoters and cannot be relied upon in good faith;

(8) whether Dr. Alexander is liable for a fraudulent failure to file addition to tax pursuant to section 6651(f) for the taxable year 2003. We hold that he is not;

(9) whether Dr. Alexander is liable for an addition to tax pursuant to section 6651(a)(2) for taxable year 2003. We hold that he is;

(10) whether Dr. Alexander is liable for an addition to tax pursuant to section 6654 for the taxable year 2003. We hold that he is;

(11) whether Dr. and Mrs. Alexander are liable for additions to tax pursuant to section 6651(a)(1) for the taxable years 2002 and 2003. We hold that they are;

(12) whether Mrs. Alexander is entitled to relief from joint and several liability for the taxable years 1999 through 2003 pursuant to section 6015(b), (c), and/or (f). We hold that she is not;

**[\*11]** (13) whether Dr. Alexander was an employee of Fountain during the quarters ended March 31, 1999, through and including December 31, 2003. We hold that he was an employee of Fountain;

(14) whether Fountain is entitled to relief under the Revenue Act of 1978, Pub. L. No. 95-600, sec. 530, 92 Stat. at 2885, as amended (section 530), with respect to Dr. Alexander for the quarters ended March 31, 1999, through and including December 31, 2003. We hold that Fountain is not entitled to relief under section 530;

(15) whether Fountain is liable for employment taxes on the compensation it paid for Dr. Alexander's services during the taxable quarters ended March 31, 1999, through and including December 31, 2003. We hold that Fountain is liable;

(16) whether Fountain is liable for fraud penalties pursuant to section 6663 for the quarters ended March 31, 1999, through and including December 31, 2003. We hold that Fountain is not liable;

(17) whether Fountain is liable for penalties pursuant to section 6662 for the quarters ended March 31, 1999, through December 31, 2003. We hold that Fountain is liable; and

(18) whether Fountain is liable for penalties pursuant to section 6656. We hold that Fountain is.

[*12]                                FINDINGS OF FACT

Some of the facts have been stipulated and are so found.

Dr. and Mrs. Alexander resided in Ohio when they filed their respective petitions. Fountain operated principally out of Centerville, Ohio, when its petition was filed.

1. Dr. and Mrs. Stanley Alexander

Dr. Alexander was born in 1948 and married Mrs. Alexander in 1991, and they have a daughter who was born in 1996. Dr. Alexander graduated from Otterbein College in Ohio in 1971 with a bachelor's degree with distinction in chemistry and biology and a minor in mathematics. Dr. Alexander attended the Ohio State University College of Medicine and graduated in 1975. Upon graduating from medical school, Dr. Alexander: (1) did a residency at University Hospital at Duke University, North Carolina; (2) did a fellowship at the National Heart, Lung, and Blood Institute in Bethesda, Maryland; (3) did research in cardiovascular surgery at the Ohio State University, and in 1981 completed his general surgery residency; and (4) did a two-year fellowship in plastic and reconstructive surgery at the University of Missouri in Columbia.

Dr. Alexander served as an officer and physician in the U.S. Air Force. At the time Dr. Alexander was on active duty in San Antonio, Texas, he was a

**[\*13]** professor of plastic surgery at the Air Force medical training center. Dr. Alexander was honorably discharged from the Air Force in 1987 with the rank of lieutenant colonel.

Mrs. Alexander received a bachelor's degree in fine arts from Wright State University in Dayton, Ohio. In addition, Mrs. Alexander took accounting and computer programming courses at Sinclair Community College during the late 1970s.

Following his retirement from the military, Dr. Alexander purchased an 80-acre farm. During the years in issue, five horses were on the farm. The horses were never shown or sold by either Dr. or Mrs. Alexander. Over 40 acres of the farm consisted of either corn or beans planted and harvested by third parties. Mrs. Alexander spent substantial time daily working with the horses on the farm, and she and Dr. Alexander also raised hay on the farm. Mrs. Alexander did not keep regular records of the farm activity.

For 1999 through 2002, Dr. and Mrs. Alexander attached Schedules F, Profit or Loss From Farming, to their Forms 1040 reporting farming activity as follows:

| [*14] | 1999 | 2000 | 2001 | 2002 |
|---|---|---|---|---|
| Gross receipts | $2,671 | $1,495 | $2,600 | $2,600 |
| Expenses | -0- | -0- | -0- | -0- |
| Depreciation | -0- | 6,000 | 3,146 | 5,301 |
| Other expenses | 2,557 | 2,794 | 20,711 | 21,376 |
| Net profit/loss | 114 | (7,299) | (21,267) | (18,776) |

For the farming activity expenses claimed, the Alexanders did not provide any substantiation. Mrs. Alexander provided Dr. Alexander the information regarding the farm and rental activities for purposes of preparing their joint Federal income tax returns.

2. Fountain Skin Care, Cosmetic, Plastic & Reconstructive Surgery, Inc.

Fountain, an S corporation, was incorporated in the State of Ohio on February 14, 1997. Dr. Alexander is and has always been the sole shareholder and officer of Fountain. Fountain's primary place of business was in Centerville, Ohio. When Fountain was established, all employees of Stanley L. Alexander, M.D., Inc. (SLAMD), automatically became employees of Fountain without any change in their job descriptions or duties. Dr. Alexander continued to perform the same supervisory duties over the staff at Fountain as he had at SLAMD. Dr. Alexander had the right to "hire and fire" Fountain's employees. Fountain had four employees: Dr. Alexander, Elizabeth Selm (a registered nurse, from 1987 through 2009), Mary Jo Lambeth (classified as a "biller", which position she

[*15] continues to hold), and Mrs. Alexander.  Dr. Alexander was the sole physician working at Fountain.

Dr. Alexander personally kept track of his basis in Fountain.  During the years 1999 through 2003 Mrs. Alexander worked part time at Fountain, and she continued to work there at the time of trial.  The wages she received from Fountain from 1999 through 2002 were reported on her Forms W-2, Wage and Tax Statement, and on her returns.  Mrs. Alexander also had signatory authority on Fountain's bank account and has signed checks drawn on that account.  Mrs. Alexander regularly signed checks from Fountain's bank accounts payable to Professional Leasing Services, Inc. (PLS), a Nevada corporation.  PLS was owned 100% by Anthony Kritt, an attorney and certified public accountant.

Fountain had checking accounts with Lebanon Citizens National Bank and Liberty Mutual Savings Bank.  Dr. Alexander did not have a bank account in his name during the years in issue and up to the present.  Mrs. Alexander had a bank account with Lebanon Citizens National Bank.  Both Mrs. Alexander and Sarah Martens, Mrs. Alexander's sister,  had signatory authority over the Ruth Anne Alexander Revocable Trust's (RAART) bank account.  RAART was created in October 1993 as a grantor trust by Mrs. Alexander.

[*16] In 2001 Ms. Martens resigned, and Mrs. Alexander became solely responsible for maintaining the books and records for RAART.

3. Stanley L. Alexander, M.D., Inc.

After leaving the military in 1987, Dr. Alexander opened a business as a sole proprietorship providing plastic and reconstructive surgery services. By 1989 Dr. Alexander incorporated SLAMD, his plastic and reconstructive surgery business. Dr. Alexander was the sole shareholder, officer, and doctor of SLAMD. At all times, SLAMD treated Dr. Alexander as an employee. Dr. Alexander earned a salary of $96,000 from SLAMD in 1996. Mrs. Alexander testified that her monthly income of $4,040 was paid by Dr. Alexander.

Donald Hoke, a certified public accountant, prepared some of SLAMD's corporate tax returns. Mrs. Alexander did some recordkeeping for SLAMD and occasionally provided Mr. Hoke with the information necessary to prepare SLAMD's tax returns. Mrs. Alexander was the primary contact for Mr. Hoke at SLAMD. Mr. Hoke prepared SLAMD's 1996 Form 1120S, U.S. Income Tax Return for an S Corporation. Dr. Alexander signed all Federal tax returns filed on behalf of SLAMD. Dr. Alexander had overall supervision of employees who worked at SLAMD.

**[*17]** The office space in Centerville, Ohio, where SLAMD was run was owned by RAART beginning in 1993. Dr. and Mrs. Alexander were named as the original trustees in the trust agreement drafted by William Montague, an estate planning attorney who assisted the Alexanders in the formation of their trusts. In April 1996 Dr. and Mrs. Alexander removed themselves as trustees from RAART and appointed Ms. Martens (the younger sister of Mrs. Alexander) as trustee through a memorandum of trust prepared by Mr. Montague.

SLAMD owed delinquent employment taxes for April, August, October, and November 1996, and as a result respondent seized funds from SLAMD's bank accounts The corporation was dissolved by the State of Ohio in 1999.

4. Anthony Kritt

Mr. Kritt had a degree in accounting and became a certified public accountant in 1978, but he stopped practicing accounting in 1987. He went to law school, and he became an attorney in 1985. Mr. Kritt was not a financial investment professional and never held a license to sell securities or offer investment advice. In addition, Mr. Kritt does not hold a medical license or any kind of formal training or education in medicine or health care. Mr. Kritt did not prepare the Alexanders' tax returns.

[*18] Before the years in issue, Dr. Ronald Bush, a colleague and future business partner of Dr. Alexander, introduced Mr. Kritt to David Tedder, an attorney with a firm in Florida. While visiting Mr. Tedder in Florida, Mr. Kritt met Kenneth Reiserer, an attorney at Mr. Tedder's law firm.

5. The Cincinnati Vein Clinic & the Midwest Vein Center

Dr. Alexander and Dr. Ronald Bush, an Ohio vascular surgeon whom Dr. Alexander first met in the mid-1990s, became business partners in January 1997 at the Cincinnati Vein Clinic & the Midwest Vein Center (CVC). Dr. Alexander, NESL, and/or PLS allegedly held the exclusive right to lease Dr. Alexander's services during the period that he worked at CVC. However, there were no signed agreements between CVC and/or Midwest Vein Center and either NESL or PLS to lease Dr. Alexander's services.

6. Kenneth Reiserer

Kenneth Reiserer is an attorney who had his own law firm in Seattle, Washington, during the mid-1990s. His clients participated in offshore employment leasing (OEL) transactions. The first time Dr. Alexander met Mr. Reiserer was at an October 1996 Galen Co. (Galen) seminar in the Bahamas. Before the Galen seminar, Mr. Reiserer never did any legal work for Dr.

[*19] Alexander. However, Mr. Reiserer provided Dr. Alexander with documentation about the OEL transaction at the October 1996 Galen seminar in the Bahamas.

7. Galen Co./Da Vinci Group

Galen was a side business of Dr. Bush that put on seminars in the Bahamas in the mid-1990s primarily intended for medical professionals. The seminars featured presentations on topics including captive insurance, income deferral programs, and OEL transactions.

Dr. Bush was in charge of the overall organization of Galen's seminars. Galen later became known as Da Vinci Group, but no substantive changes came as part of the name change.

Dr. Bush asked Mr. Kritt to attend a Galen seminar. At the initial seminar Mr. Kritt learned about the OEL transaction from Mr. Reiserer. Dr. Bush asked Mr. Kritt to make presentations at future seminars, which he did on several occasions. Mr. Kritt also made presentations on OEL transactions at seminars in the United States. Through his presentations at the Galen seminars, Mr. Kritt obtained new clients, including four individuals who set up the OEL transactions. Mr. Kritt's promotional materials described the tax benefits associated with the OEL transactions. In addition to Mr. Kritt, Mr. Reiserer and Ken Wheeler, a tax

[*20] attorney who practiced in Florida for approximately 40 years, including 4 years with the Internal Revenue Service (IRS), made presentations at Galen seminars.

Mr. Wheeler's relationship with Galen consisted solely of speaking at several seminars regarding tax planning and the legal requirements associated with offshore financial activity. Mr. Wheeler never made presentations or entered into any agreements to participate in the OEL program. It was Mr. Wheeler's understanding that Mr. Reiserer was the architect of the OEL transaction.

8. Offshore Employee Leasing Transaction

Dr. Alexander and Dr. Bush discussed the concept of an OEL transaction in the early 1990s. Dr. Bush was a client of Mr. Kritt. Dr. Bush was knowledgeable about how the OEL transaction operated and had also participated in an OEL transaction. Subsequently, Dr. Bush invited Dr. Alexander to a seminar in the Bahamas that included an OEL presentation. Mrs. Alexander attended the Bahamas seminar with Dr. Alexander in October 1996, and both attended a presentation made by Mr. Reiserer on OEL transactions. After leaving the Bahamas in October 1996, Dr. Alexander had extensive discussions with Mr. Kritt, Dr. Bush, and Mr. Reiserer about the OEL transactions before agreeing to go forward with such a transaction. Before participating in the OEL transaction, Dr.

[*21] Alexander had never conducted any business with or worked for an offshore entity. After the seminar, Dr. Alexander paid $99,000 through SLAMD to Messrs. Kritt and Reiserer through a domestic leasing company called Nationwide Executive Staff Leasing, Inc. (NESL), to start the OEL transaction.

Messrs. Kritt and Reiserer structured, implemented, and managed the Alexanders' OEL transaction. Mr. Kritt managed and made all contacts with the offshore entities involved with Dr. Alexander's OEL transaction on his behalf. Mr. Kritt explained in detail to Dr. Alexander how the OEL transaction worked. Dr. and Mrs. Alexander agreed to retain Mr. Kritt's services to implement an OEL transaction in December 1996. Dr. Alexander began participation in the OEL transaction in December 1996.

The following steps were involved in Dr. Alexander's OEL transaction:

(1) Dr. Alexander signed a contract with an OEL company granting that company exclusive right to offer his services to an employer in exchange for wages and additional compensation upon retirement;

(2) Dr. Alexander's services were assigned to a U.S. employee leasing company by the OEL company;

[*22]    (3)  Dr. Alexander's corporation signed a contract with a domestic (U.S.) leasing company for the right to use Dr. Alexander's services in exchange for an agreed-upon fee;

(4)  the domestic leasing company paid a portion of the funds received from Dr. Alexander's corporation as wages;

(5)  the domestic leasing company paid the remainder of the funds received from Dr. Alexander's corporation to the offshore leasing company (after withholding a 4% fee); and

(6)  the offshore leasing company withheld its fee and then transferred the funds to other offshore entities which, after taking their fees, would eventually place the funds into an offshore account for Dr. Alexander.

Dr. Alexander continued to participate in the OEL program through 2003. In April 2003 Mr. Kritt became aware of Notice 2003-22, 2003-1 C.B. 851, and had a discussion with Dr. Alexander explaining that the notice indicated that the IRS considered the OEL program abusive.  Mr. Kritt indicated potential penalties that Dr. Alexander could face if he continued with the OEL transaction.  Although Mr. Kritt made Dr. Alexander aware of Notice 2003-22, supra, Dr. Alexander never read it.  However, Mr. Kritt assured Dr. Alexander that in  his opinion the

[*23] program was legitimate and did not involve any aspects that should invalidate it. Dr. Alexander relied upon the opinion of Mr. Kritt.

Blenheim/Elfin, the company that helped facilitate loans in Dr. Alexander's OEL transaction, informed Mr. Kritt in an email dated September 6, 2002, that the IRS was likely to challenge the legitimacy of the loans obtained through an OEL transaction and that the IRS would find that "any such challenge would most likely be an insurmountable uphill battle." The record is unclear as to whether Dr. Alexander saw this correspondence.

In 2003 the IRS initiated a criminal investigation of Mr. Kritt related to his involvement with OEL transactions and seized a number of records, including some related to Dr. Alexander's OEL transaction. Mr. Kritt was charged with criminal tax evasion and conspiracy as a result of his involvement with OEL transactions. However, after a trial which took place after the years in issue in these cases, Mr. Kritt was found not guilty of any criminal misconduct in connection with his involvement in OEL transactions.

9. Nationwide Executive Staff Leasing, Inc.

Nationwide Executive Staff Leasing, Inc. (NESL), a Nevada corporation, was owned 1% by Mr. Kritt and 99% by Mr. Reiserer. Mr. Kritt was an officer and held the title of vice president. NESL was set up solely to facilitate Messrs.

[*24] Reiserer and Kritt's clients' participation in OEL transactions. NESL acquired rights to the services of other OEL clients and leased those rights to clients' businesses for a fee as part of OEL transactions. The 4% fee was split evenly between Messrs. Kritt and Reiserer, who subtracted the funds paid to NESL by Fountain. Mr. Kritt had access to all financial records maintained by NESL on behalf of Dr. Alexander.

Despite the contractual terms which required that Dr. Alexander be paid a minimum wage of $67,000 in both 1997 and 1998, NESL paid Dr. Alexander only $50,250 and $16,750, respectively. When Mr. Reiserer became aware that NESL had fallen behind on its obligations to pay Dr. Alexander's wages, Mr. Reiserer suggested that Mr. Kritt could have $35,000 recently sent offshore returned to NESL.

A disagreement arose between Mr. Kritt and Mr. Reiserer. As a result, Dr. Alexander issued a letter (drafted by Mr. Kritt) to Mr. Reiserer, dated November 28, 1998, terminating Fountain's agreement with NESL. As a result, Mr. Reiserer faxed a settlement agreement terminating the relationship, dated March 24, 1999, to Dr. Alexander and Mr. Kritt.

[*25] 10. <u>Professional Leasing Services, Inc.</u>

PLS was incorporated on September 3, 1999, in Nevada. PLS was owned 100% by Mr. Kritt, who was also its sole officer. Following the end of Mr. Kritt and Mr. Reiserer's professional relationship, Mr. Kritt formed PLS to replace NESL as the domestic employee leasing company component in OEL transactions with his clients. Mr. Kritt maintained all books and records for PLS, including ledgers and spreadsheets reflecting OEL transactions. On these ledgers and spreadsheets there was a column titled "salary" which represented the funds transferred to Dr. Alexander as "wages" out of the amount of funds originally transferred from Fountain to PLS. PLS kept 4% of the fees paid by Fountain after PLS replaced NESL as the domestic leasing company in Dr. Alexander's OEL transaction.

11. <u>Montrain Services, Inc.</u>

Montrain Services, Inc. (Montrain), was an entity formed in Ireland which obtained the rights to services provided by U.S. citizens and then leased them back to businesses in the United States. Neither Dr. Alexander nor Mr. Kritt considered any offshore leasing company other than Montrain when Dr. Alexander initially agreed to participate in the OEL transaction. The contract between Dr. Alexander and Montrain was a pro forma document used by Messrs. Kritt and Reiserer for all

[*26] of their OEL clients. At the time Dr. Alexander agreed to participate in the OEL transaction, he was aware that he would continue to work for Fountain as he had previously.

The terms of his contract with Montrain purportedly restricted access to his offshore account until his retirement. Dr. Alexander repatriated his transferred funds to RAART through a line of credit with an offshore entity; the remainder was to be put aside for Dr. Alexander's benefit although he knew he could access the funds before his retirement if necessary. Although the contract signed with Montrain prohibited the borrowing of funds from Dr. Alexander's offshore account, Dr. Alexander was aware at the time he agreed to participate in the OEL transaction that Montrain was going to assign the rights to his services to NESL. The contract between Montrain and NESL was another pro forma document used by Messrs. Kritt and Reiserer for all of their OEL clients. Dr. Alexander did not receive a copy of this contract. Fees were subtracted from the funds paid from Fountain to either NESL or PLS and then transferred offshore.

Dr. Alexander and Mr. Kritt terminated their agreement with Montrain in December 1998. Dr. Alexander understood that terminating his agreement was a mere formality because the funds would remain in place, and the OEL transaction retained the same terms but with a different offshore company.

[*27] On December 29, 1998, Mr. Reiserer sent a letter to Joe Kenney at Montrain transmitting a copy of a letter by Dr. Alexander terminating the agreement between Dr. Alexander and Montrain, effective December 31, 1998. After he terminated his contract with Montrain, Dr. Alexander's day-to-day duties at Fountain did not change.

12. International Advisory Services, LLC

International Advisory Services Limited Liability Co. (IALB), a Hungarian company, was set up to be an employee leasing company designed to obtain the rights to the services of U.S. citizens and lease those services back to companies and corporations in the United States. Dr. Alexander never visited Hungary or IALB's offices.

Mr. Kritt was aware that IALB replaced Montrain in his OEL transaction. As of the effective date of the employment contract Dr. Alexander signed with IALB, he knew that IALB would be assigning the rights to his services to PLS.

Pursuant to the terms of the contract between IALB and Dr. Alexander, IALB would have sole discretion to decide whether to pay any money to Dr. Alexander as part of a postretirement income program. However, IALB ceded control over Dr. Alexander's retirement benefits in its agreement with Rosmol Commercial Co. Ltd. (Rosmol). Dr. Alexander's contract also required IALB to

[*28] provide Dr. Alexander with an annual report on the fund balance in his offshore account; IALB failed to do so. In addition the contract provided that Dr. Alexander was not allowed to borrow moneys from his offshore account.

13. Rosmol

Rosmol was a Cyprus corporation set up as a conduit to assist individuals participating in OEL transactions from offshore employee companies to Ruritania. The purpose of Rosmol in the OEL transaction was to allow Montrain to avoid Irish taxes on the funds that it received in the OEL transaction. Although Dr. Alexander agreed for Rosmol to be a party to the OEL transaction, he never visited Cyprus nor had any communications with anyone from Rosmol.

14. Ruritania

Ruritania was an entity formed in the Isle of Jersey to aid individuals wanting to participate in OEL transactions. Dr. Alexander never visited the Isle of Jersey or communicated with Ruritania. Dr. Alexander knew that Ruritania's role in the OEL transaction was to be the repository of his offshore funds. Ruritania 70 was the name of Dr. Alexander's offshore bank account. Dr. Alexander had control over his funds and investments made with the funds held in Ruritania 70. Before Dr. Alexander's participation in the OEL transaction, he understood that he could have access to his offshore funds through loans. The transaction with

[*29] Associated Enterprises, Ltd., discussed infra section 16 is an example of the use of a credit line to finance access to the offshore funds.

Dr. Alexander could also cause investments to be made. In 1998 Mr. Kritt, at the request of Dr. Alexander, directed that $90,000 in his offshore account, Ruritania 70, be invested in Ecotyre Technologies, Inc. (Ecotyre).

15. London & Capital

London & Capital was an investment firm in London, England. London & Capital met with clients who participated in OEL transactions to discuss their investment strategies and the disposition of their portfolios. London & Capital provided investment advice to Dr. Alexander regarding the funds he held in his offshore account and actively managed his account. London & Capital provided Mr. Kritt with copies of Dr. Alexander's offshore account investment statements.

16. Associated Enterprises, Ltd.

Associated Enterprises, Ltd. (AEL), was an offshore shell company organized under the laws of the Isle of Man. It existed to create loans for clients involved with OEL transactions. Dr. and Mrs. Alexander did not have any direct contact with anyone at AEL. All communication related to AEL was through Mr. Kritt. Mr. Kritt made arrangements to document the alleged line of credit to RAART from AEL for Dr. and Mrs. Alexander, although Mrs. Alexander also

[*30] filled out some of the documentation to finalize specific transactions. The initial request to obtain a line of credit with AEL was from Dr. and Mrs. Alexander; subsequently the line of credit was taken out in the name of RAART. However, AEL's internal documentation, including references to Dr. Alexander's passport, reflects that Dr. Alexander was the sole party to the agreement.

Mr. Kritt drafted the secured revolving line of credit agreement and promissory note between RAART and AEL, both of which were dated June 9, 2000, and signed by Peter Howe, managing director of AEL, on behalf of AEL and Ms. Martens, Mrs. Alexander's younger sister and a trustee of RAART. Ms. Martens had no duties as a trustee of RAART, but she was named as trustee by Dr. and Mrs. Alexander. Mrs. Alexander was responsible for obtaining Ms. Martens' signature on documents related to RAART. Ms. Martens suffered from serious health problems and died in 2002.

17. Blenheim Fiduciary Group Ltd./Elfin Trust Group

Elfin Trust Group (Elfin) was an entity headquartered on the Isle of Guernsey and wholly owned by the Blenheim Fiduciary Group (Blenheim). Blenheim is an entity also headquartered on the Isle of Guernsey. The two entities share the same address. Elfin is the former name of Blenheim, which changed its name sometime in the late 1990s or early 2000s. Elfin's promotional

[*31] materials stated that it would not accept new clients without receiving "a due diligence declaration". However, Dr. Alexander became a client of Elfin more than six months before providing a "due diligence declaration".

Blenheim offered services to prepare paperwork and file registration documentation to establish businesses or other entities in various foreign countries, although Blenheim did not have any of its own employees in any foreign countries. Blenheim acted as the registered officer for dozens of companies based on the Isle of Guernsey. Blenheim's promotional materials contained a section on "loans to beneficiaries" which made both Mr. Kritt and Dr. Alexander aware of the possibility of obtaining funds from the offshore account set up as part of the OEL transaction before Dr. Alexander's becoming a participant in the transaction.

During the IRS audit of Dr. and Mrs. Alexander's returns, the IRS obtained documents through the Tax Information Exchange Agreement, U.S.-Guernsey, Sept. 19, 2002, Tax Treaties (CCH) para. 3613 (U.S.-Guernsey Agreement) pursuant to the Convention for the Avoidance of Double Taxation and the Prevention of Fiscal Evasion With Respect to Taxes on Income and on Capital Gains, U.S.-U.K., art. 27, July 24, 2001, Tax Treaties (CCH) para. 10,901.001 (U.S.-U.K. Convention).

[*32] 18.  Returns

Dr. Alexander prepared the joint 1999, 2000, 2001, and 2002 Forms 1040 for himself and Mrs. Alexander.  Neither Dr. Alexander nor Mrs. Alexander filed a tax return for 2003.   Dr. Alexander reported wage income on their Forms 1040 for 1999-2002 of $73,300, $51,000, $94,554, and $76,900, respectively, from NESL.  Despite having an offshore account, Dr. Alexander did not attach a Schedule B, Interest and Ordinary Dividends, to his 1999, 2000, or 2002 tax return.  On his 2001 tax return, despite having an offshore account, Dr. Alexander checked both boxes on the return indicating that he did not have an interest in an offshore account.  However, Dr. Alexander attached a Form 8886, Reportable Transaction Disclosure Statement, prepared by Mr. Kritt, to his Form 1040 for 2002, describing the OEL transaction.

Dr. and Mrs. Alexander attached Schedules F to their Forms 1040 for 1999-2002 reflecting income and expenses from a farming activity by Mrs. Alexander.

Mr. Kritt advised Dr. Alexander that he had an income tax return filing requirement for 2003.  For 1999, 2000, 2001, and 2002 Dr. Alexander requested extensions of time to file, but he did not file the returns until several months after the extended date.  In the case of the 2002 return, the return was not filed until over a year after the extended dates.   Mrs. Alexander did not review the 1999,

[*33] 2000, 2001, and 2002 tax returns and simply relied upon her husband and his advisers. Mr. Kritt also did not review the returns before they were filed.

A Form 872, Consent to Extend the Time to Assess Tax, for years ended December 31, 1999 and 2000, was executed by Dr. and Mrs. Alexander on December 23, 2004, extending the assessment period through June 30, 2006. A Form SS-10, Consent to Extend the Time to Assess Employment Taxes, for the periods ended January 1 through December 31, 2000, was executed by Mr. Kritt on behalf of Fountain on June 30, 2006, extending the assessment period through June 30, 2007.

Mrs. Alexander reported on her Form 8857, Request for Innocent Spouse Relief, filed March 1, 2012, that she continued to operate her farming activity. On her Form 8857, Mrs. Alexander stated that her monthly income was $4,040 and that her monthly income was received from Dr. Alexander. She claimed monthly expenses of $1,500 but no gross receipts from the farming activity.

OPINION

I. Burden of Proof

The Commissioner's determinations in the notice of deficiency are presumed correct, and the taxpayer bears the burden of proving, by a preponderance of the evidence, that the determinations of the Commissioner are

[*34] incorrect. Rule 142(a); <u>Welch v. Helvering</u>, 290 U.S. 111, 115 (1933).

However, section 7491(a)(1) provides that subject to certain limitations, where a taxpayer introduces credible evidence with respect to any factual issue relevant to ascertaining the taxpayer's liability for tax, the burden of proof shifts from the taxpayer to the Commissioner as to the factual issue. Section 7491(a)(2) sets forth requirements the taxpayer must meet before the burden of proof will shift. Petitioners have not met these requirements in these cases.

## II. <u>Deficiencies of Dr. and Mrs. Alexander</u>

### A. <u>Statute of Limitations</u>

Tax generally must be assessed within three years after the return was filed. Sec. 6501(a). The Alexanders assert the limitations period for assessment of income taxes has expired with respect to Dr. and Mrs. Alexander's taxable years 1999, 2000, and 2001.

For 1999 and 2000 Dr. and Mrs Alexander executed a Form 872 extending the assessment period through June 30, 2006. Dr. and Mrs. Alexander did not file their 2001 return until February 13, 2003. Respondent mailed a notice of deficiency on January 10, 2006, less than three years after Dr. and Mrs. Alexander filed their 2001 return and before the extended assessment period for the 1999 and

**[*35]** 2000 returns expired. Therefore, the limitation periods have not run for assessing tax for 1999, 2000, and 2001. See sec. 6503(a)(1).

B. Underpayment of Wage Income to Dr. Alexander

Respondent determined Dr. Alexander had unreported wage income of $342,254, $354,216, $433,500, $548,100, and $490,000 for 1999, 2000, 2001, 2002, and 2003, respectively. Dr. Alexander contends that the unreported wages were part of a nonqualified deferred compensation plan designed to defer the receipt and taxation of the wages received by Dr. Alexander. Respondent contends that Dr. and Mrs. Alexander constructively received the money placed in the offshore account when it was transferred into the account. Respondent additionally contends that the OEL arrangement is a sham and should be disregarded under the economic substance doctrine as a transaction to avoid Federal taxation.

1. Constructive Receipt of Money Transferred Into the Deferred Compensation Plan

The Alexanders' argument that the OEL transactions were part of a deferred compensation plan fails because the alleged plan violates the doctrine of constructive receipt. Income will be deemed to be constructively received by a taxpayer in the taxable year in which "it is credited to his account, set apart for

[*36] him, or otherwise made available so that he may draw upon it at any time, or so that he could have drawn upon it during the taxable year if notice of intention to withdraw had been given." Sec. 1.451-2(a), Income Tax Regs. Only when a taxpayer's control of the receipt of income is subject to substantial limitations will it not be deemed to have been constructively received. See id.

The constructive receipt doctrine requires a taxpayer who is on the cash method of accounting to recognize income when the taxpayer has an unqualified, vested right to receive immediate payment of income. See Palmer v. Commissioner, T.C. Memo. 2000-228. Under the constructive receipt doctrine, a taxpayer may not deliberately turn his back on income otherwise available. See Martin v. Commissioner, 96 T.C. 814, 823 (1991).

Petitioners argue the contracts restrict Dr. Alexander's access to the funds until he reaches the age of 70 or retires. However, the evidence shows that he had access to and control over the funds at the time the money was placed into the Ruritania 70 account. He was able to give investment directives, as evidenced by the 1998 investment in Ecotyre. Dr. Alexander also accessed the funds through a line of credit between AEL and RAART. Though the evidence does not establish that Dr. Alexander understood that the line of credit was a sham, the record reflects that the money received in the form of a line of credit from AEL actually

**[*37]** came from the Ruritania 70 account and was not a commercial loan as the Alexanders contend.

Consequently, we conclude that the money Fountain transferred as part of the OEL transactions was constructively received by Dr. and Mrs. Alexander in the years it was transferred and therefore is includable in Dr. and Mrs. Alexander's income for those years under section 451(a).

2. Sections 402(b)(1) and 83(a)

Under section 402(b)(1) or section 83(a), funds set aside by an employer for services performed by an employee are income to the employee. Only when the funds are not transferable or there is a substantial risk of forfeiture will there be no income to the employee. Dr. Alexander could transfer these funds through the use of a line of credit. Therefore, the funds paid by Fountain for the services of Dr. Alexander for the years 1999-2003 were income to Dr. Alexander in the year they were paid.

3. Economic Substance Doctrine

"In determining whether to attribute income to a taxpayer, the Code evaluates substance over form, asking not what the surface of a transaction suggests but what the economic realities of the transaction show." Richardson v. Commissioner, 509 F.3d 736, 740 (6th Cir. 2007), aff'g T.C. Memo. 2006-69; see

[*38] Commissioner v. Court Holding Co., 324 U.S. 331, 334 (1945). Income is taxed to the person who earns it and enjoys the benefit of it when paid. See Helvering v. Horst, 311 U.S. 112, 119 (1940); Corliss v. Bowers, 281 U.S. 376, 378 (1930); cf. Commissioner v. P. G. Lake, Inc., 356 U.S. 260, 267 (1958); Old Colony Trust Co. v. Commissioner, 279 U.S. 716, 729 (1929). Moreover, the taxpayer who earns income may not avoid taxation through anticipatory arrangements no matter how clever or subtle. Lucas v. Earl, 281 U.S. 111, 115 (1930).

In these cases there is no economic substance outside the avoidance of tax. No substantial changes were made to the business practices of Fountain, and Dr. Alexander still maintained control over the funds Fountain paid the leasing agency for his services. The economic reality of this situation is that Dr. Alexander received and controlled the funds paid to the leasing agencies for his services.

The Alexanders contend the transaction was motivated by a desire to create a retirement fund for Dr. Alexander. However, the evidence shows that the motivation behind the transaction was the avoidance of tax, and outside of the tax consequences there was no meaningful economic substance to the transaction. Mr. Kritt testified that but for the tax benefits associated with the OEL transaction,

**[*39]** it would not be cost effective for Dr. and Mrs. Alexander, or anyone else, to participate in the transaction.

Additionally, there was no change in the way Fountain or Dr. Alexander conducted business aside from the payment to the leasing agency. The only substantive changes that resulted from this activity were the taxable income Dr. and Mrs. Alexander reported and the amount of employment tax Fountain paid. As evidenced by the constructive receipt of the money in the offshore account, Dr. and Mrs. Alexander had control of the funds paid to the leasing agencies. The substance of this transaction was merely avoidance of taxation.

C. Whether Dr. and Mrs. Alexander Are Entitled to Schedule F Farming Loss Deductions for 2001 and 2002

1. Substantiation of Deductions

Dr. and Mrs. Alexander have not substantiated any of the deductions on their Schedules F. In justifying a deduction the burden of proof is on the taxpayer. Rule 142(a). Taxpayers have no inherent right to deductions; they are matters of legislative grace. Interstate Transit Lines v. Commissioner, 319 U.S. 590, 593 (1943); New Colonial Ice Co. v. Helvering, 292 U.S. 435, 440 (1934). The taxpayer must be able to point to some specific statute to justify his deduction and establish that he comes within its terms. Deputy v. du Pont, 308 U.S. 488, 493

[*40] (1940); White v. United States, 305 U.S. 281 (1938); Roberts v. Commissioner, 62 T.C. 834, 836-837 (1974). Additionally, section 6001 requires all taxpayers to keep records of their activities in a manner that will enable the determination of the correct amount of income subject to tax. Dr. and Mrs. Alexander have not substantiated any of the deductions resulting from the losses sustained from their farming activities and thus are not entitled to any of the claimed deductions for the years 2001 and 2002.

  2.  Activity Engaged In for Profit

  Dr. and Mrs. Alexander reported a grain farming activity on Schedules F of their 2001 and 2002 income tax returns. For these years they reported annual gross income of $2,600. They also reported expenses of $23,857 and $21,376, respectively, resulting in losses of $21,257 and $18,776, respectively, for those years. For them to claim these as business deductions under section 162, the farming activity must be an activity engaged in for profit. However, because they have failed to substantiate the expenses, there is no need to reach this issue.

  D.  Whether Dr. and Mrs. Alexander Are Entitled to Unsubstantiated Schedule A Mortgage Interest Deductions for 2001 and 2002

  Dr. and Mrs. Alexander have failed to substantiate mortgage interest deductions for 2001 and 2002 of $21,867 and $41,329, respectively. For the same reasons that we did not allow the Schedule F deductions (lack of substantiation),

**[\*41]** we do not allow the unsubstantiated amounts of Schedule A mortgage interest deductions.

III. <u>Penalties and Additions to Tax for Dr. and Mrs. Alexander</u>

    A. <u>Section 6663 Fraud Penalties for the Underpayments of Tax Associated With the OEL Transaction</u>

For 1999-2002 Dr. and Mrs. Alexander underpaid a substantial amount of tax for each year because of Dr. Alexander's participation in the OEL transaction. Section 6663 imposes a penalty of 75% of any portion of an underpayment that is attributable to fraud. The Commissioner has the burden of proving fraud by clear and convincing evidence. Sec. 7454(a); Rule 142(b). To satisfy his burden of proof, the Commissioner must show: (1) an underpayment of tax exists; and (2) the taxpayer intended to evade taxes known to be owing by conduct intended to conceal, mislead, or otherwise prevent the collection of taxes. <u>Sadler v. Commissioner</u>, 113 T.C. 99, 102 (1999); <u>Parks v. Commissioner</u>, 94 T.C. 654, 660-661 (1990).

    1. <u>Underpayment of Tax</u>

The clear and convincing standard applies not merely to whether an underpayment is attributable to fraud, but also to whether an underpayment exists. <u>Parks v. Commissioner</u>, 94 T.C. at 660-661; <u>Di Ricco v. Commissioner</u>, T.C. Memo. 2009-300. Where fraud is determined for each of several years, the

**[*42]** Commissioner's burden applies separately for each. Roth v. Commissioner, T.C. Memo. 1998-28. We have already established that an underpayment of tax exists for each of the years 1999-2003 because of the unreported income attributable to the services Dr. Alexander provided to Fountain.

## 2. Fraudulent Intent

The Commissioner must prove by clear and convincing evidence that a portion of the underpayment for each taxable year in issue was due to fraud. Prof'l Servs. v. Commissioner, 79 T.C. 888, 930 (1982). Once the Commissioner establishes that any portion of an underpayment is attributable to fraud, the entire underpayment is subject to the 75% penalty, except with respect to any portion of the underpayment that the taxpayer establishes is not attributable to fraud. Sec. 6663(a) and (b). The existence of fraud is a question of fact to be resolved upon consideration of the entire record. King's Court Mobile Home Park, Inc. v. Commissioner, 98 T.C. 511, 516 (1992). The taxpayer's entire course of conduct may establish the requisite fraudulent intent. Stone v. Commissioner, 56 T.C. 213, 223-224 (1971). Because direct proof of a taxpayer's intent is rarely available, fraud may be proven by circumstantial evidence and reasonably inferred from the facts. Spies v. United States, 317 U.S. 492, 499 (1943); Niedringhaus v. Commissioner, 99 T.C. 202, 210 (1992); Rowlee v. Commissioner, 80 T.C. 1111,

[*43] 1123 (1983). Certain indicia, commonly known as badges of fraud, constitute circumstantial evidence which may give rise to a finding of fraudulent intent. Bradford v. Commissioner, 796 F.2d 303, 307 (9th Cir. 1986), aff'g T.C. Memo. 1984-601. "Although no single factor is necessarily sufficient to establish fraud, the existence of several indicia is persuasive circumstantial evidence of fraud." Petzoldt v. Commissioner, 92 T.C. 661, 700 (1989).

### a. Analysis of Fraudulent Intent

In determining that Dr. and Mrs. Alexander had fraudulent intent to evade taxes, respondent places a great deal of emphasis on their education and understanding of the OEL transaction and uses this to show their awareness of the badges of fraud. Respondent contends that Dr. and Mrs. Alexander are highly educated people who knew that the OEL transaction was a tax-avoidance scheme. To make this point respondent relies on the following facts and assertions: (1) the education of Dr. and Mrs. Alexander allowed them to understand the tax implications of the transaction; (2) the fact that Dr. Alexander prepared both his personal and Fountain's corporate tax returns demonstrates an understanding of income tax; (3) Mrs. Alexander did bookkeeping work for Fountain and SLAMD; and (4) the knowledge of Messrs. Kritt and Reiserer should be imputed to Dr. and Mrs. Alexander.

[*44] While Dr. Alexander is highly educated and a very accomplished medical doctor, respondent did not establish that he understood complex tax law issues. To be sure, Dr. Alexander has a basic understanding of corporate structures and filed his own tax returns, but nothing in the records establishes that he understood the complex tax laws involved with the OEL transaction, nor that he possessed the knowledge to determine that the OEL transaction did not comply with applicable tax laws. Similarly, Mrs. Alexander does have some accounting education, but she does not possess the education or experience for the Court to hold her to a higher level of understanding when it comes to the OEL transaction.

The evidence shows that Messrs. Kritt and Reiserer explained the OEL transaction in detail to Dr. Alexander and assured him the plan complied with the tax laws. There is nothing in his education or experience that would indicate that he should have known differently. Messrs. Reiserer and Kritt structured and implemented every aspect of the OEL transaction. Dr. and Mrs. Alexander relied upon the assurance of Messrs. Reiserer and Kritt that the OEL plan conformed to the tax laws. Dr. and Mrs. Alexander do not possess the education and experience to understand that the plan did not conform to the applicable tax laws.

**[*45]** Respondent also states that the knowledge and expertise of Messrs. Kritt and Reiserer should be imputed to Dr. and Mrs. Alexander, citing the general rule that a principal is charged with the knowledge of an agent in the course of the principal's business. See Ford Motor Credit Co. v. Weaver, 680 F.2d 451, 457 (6th Cir. 1982) (citing Curtis, Collins & Hollbrook Co. v. United States, 262 U.S. 215, 222 (1923)). In this situation, Dr. and Mrs. Alexander were clients of Messrs. Kritt and Reiserer and were part of the OEL transaction owned and operated by Messrs. Kritt and Reiserer. Messrs. Kritt and Reiserer were not employees or agents participating in the business of Dr. Alexander or Fountain, and thus the general principle does not apply in this situation. The limited ability to understand the tax laws associated with the OEL transaction and the reliance upon their tax advisers to have the plan comply with the tax laws show the Alexanders did not have fraudulent intent.

### b. Badges of Fraud

Respondent cites numerous badges of fraud to show circumstantial evidence of fraud in his conclusion that Dr. and Mrs. Alexander had fraudulent intent. However, the record shows that the fraudulent intent element is missing.

**[\*46]**                    i.  Consistent Pattern of Underreporting

Dr. and Mrs. Alexander underreported their income for four consecutive years. "A consistent pattern of underreporting large amounts of income is evidence of fraud." Garcia v. Commissioner, T.C. Memo. 2012-155 (citing Holland v. United States, 348 U.S. 121 (1954)).  However, the reason for the underreporting was their reliance on the legitimacy of the OEL plan.  This does not support a finding of intent to evade taxes known to be owed because Dr. and Mrs. Alexander did not know that they owed additional tax at the time.  After Notice 2003-22, supra, was released, describing OEL transactions as abusive, Dr. and Mrs. Alexander were again assured by both Mr. Kritt and a group of lawyers that Mr. Kritt's OEL transaction conformed to the applicable tax laws and treaties.  While the reliance by the Alexanders may not have been reasonable, their reliance was not fraudulent.

ii.  Lack of Credibility of the Taxpayer's Testimony

We found Dr. and Mrs. Alexander to be credible in their testimony.  Mr. Kritt implemented the OEL plan, and Dr. and Mrs. Alexander relied upon him to make the plan conform to the applicable tax laws.  The record and their testimony reflect this reliance.

**[\*47]**                    iii.  Concealment of Income or Assets

Respondent claims Dr. and Mrs. Alexander took affirmative steps to conceal their income and assets and misled respondent as to their actual taxable income. Dr. and Mrs. Alexander used the OEL transaction to lower their taxable income, and they denied the existence of an offshore account on the 2001 tax return. While these facts are potential badges of fraud, the record does not establish these acts were intentionally designed to deceive or conceal.

On their 2002 income tax return not filed until May of 2005 but before the notice of deficiency in 2006, Dr. and Mrs. Alexander disclosed the OEL transaction in a Form 8886 attached to their tax return. The RAART Trust was created in 1993, several years before Dr. and Mrs. Alexander's introduction to the OEL transaction. Finally, we find that while he had access to financial statements of the Ruritania 70 account, Dr. Alexander did not actually understand that he had an ownership interest or any signatory authority over the account. His misunderstanding alleviates fraud in these cases.

**[*48]**
        iv. <u>Dr. and Mrs. Alexander's Failure to Maintain Adequate Records Pertaining to Their Participation in the OEL Transaction and To Fully Cooperate in the Examination of Their Returns or in the Litigation</u>

Because he was unable to obtain information from Dr. and Mrs. Alexander, respondent was forced to obtain many documents through the U.S.- Guernsey agreement and article 27 of the U.S.-U.K. Convention. Failing to cooperate with the authorities is a badge of fraud. In these cases, it appears that Dr. Alexander may have had access to some information regarding their offshore accounts, but Dr. and Mrs. Alexander did not possess many of the documents respondent requested.

        v. <u>Failure To File a Return for 2003</u>

Failing to file a return is a badge of fraud, and Dr. and Mrs. Alexander did not file any return for 2003. Dr. Alexander testified that he had concerns that filing any postchallenge return would be construed as either an admission or a continuation of the improper transaction. Though this concern is no excuse for not filing a tax return, Dr. Alexander's testimony explains that the reason for not filing did not include the intent to commit fraud and evade taxes.

**[*49]**                    vi.  <u>Dr. and Mrs. Alexander's Attempts at Distancing</u>
<u>Themselves From the OEL Transaction</u>

Fraudulent intent can be inferred from the willful blindness of the taxpayer. See <u>Fields v. Commissioner</u>, T.C. Memo. 1996-425.  Respondent bases his argument that Dr. and Mrs. Alexander were willfully blind on several facts.  Dr. and Mrs. Alexander did not directly communicate with anyone offshore.  Dr. Alexander did not request offshore account statements from Montrain and IALB. Mrs. Alexander did not review her joint tax return before it was filed.  Finally, after learning of the IRS' concern over OEL transactions and the criminal investigation of Mr. Kritt, Dr. Alexander did not seek independent advice.

We believe Dr. and Mrs. Alexander distanced themselves from the transaction because Messrs. Kritt and Reiserer planned, structured, and implemented the entire OEL transaction.  Dr. and Mrs. Alexander relied on these individuals to implement the transaction; it is reasonable that they would have left the communication with the offshore persons to Messrs. Kritt and Reiserer.  Dr. Alexander's lack of concern over the criminal investigation of Mr. Kritt and the fact that the IRS disfavored the OEL transactions is troubling but not evidence of fraudulent intent.

**[\*50]**      3.  <u>Conclusion</u>

We find that Dr. and Mrs. Alexander did not intend to evade taxes that they believed to be owed.  Dr. and Mrs. Alexander placed a great deal of reliance on Mr. Kritt and believed the OEL transaction complied with the tax laws.  They do not possess the education or experience that would allow them to know that they should have reported the additional income.  Even though their reliance in Mr. Kritt was misplaced and many badges of fraud do exist in this situation, respondent has not proven fraud by clear and convincing evidence.[3]

B.  <u>Section 6662(a) Penalty for Underpayment of Tax</u>

As we have found no fraud for which the penalty under section 6663 could apply, Dr. and Mrs. Alexander may be liable for a 20% accuracy-related penalty under section 6662(a) and (b)(2) for an underpayment of tax attributable to a substantial understatement of income tax.  Under section 7491(c), the Commissioner bears the burden of production with regard to penalties and must come forward with sufficient evidence indicating that it is appropriate to impose

---

[3]In at least two other cases involving similar schemes to allegedly lease services to offshore entities, we have sustained additions to tax for fraud.  <u>See</u>, <u>Browning v. Commissioner</u>, T.C. Memo. 2011-261; <u>Foxworthy, Inc. v. Commissioner</u>, T.C. Memo. 2009-203.  However, we must analyze the facts of the case before us, and we find that Dr. Alexander's decision to engage in the transactions at issue is based on misguided reliance on his advisers and not the intent to fraudulently evade tax.

[*51] penalties.  See Higbee v. Commissioner, 116 T.C. 438, 446 (2001).

However, once the Commissioner has met the burden of production, the burden of

proof shifts to the taxpayer, including the burden of proving that the penalties are

inappropriate because of reasonable cause under section 6664.  See Rule 142(a);

Higbee v. Commissioner, 116 T.C. at 446-447.

### 1.  Substantial Understatement

A substantial understatement of income tax exists where the understatement

exceeds the greater of $5,000 or 10% of the tax required to be shown on the

return.  Sec. 6662(d)(1)(A)(i) and (ii).  For all years between 1999-2002, Dr. and

Mrs. Alexander's understatements exceed 10% of the tax required to be shown on

the returns, which is greater than $5,000.  Therefore, respondent has met the

burden of production in these cases.

### 2.  Reasonable Cause Under Section 6664

The Alexanders assert good-faith reliance upon their tax advisers, Messrs.

Kritt and Reiserer, for their reasonable cause defense to a section 6662(a) penalty.

"No penalty shall be imposed under this part with respect to any portion of an

underpayment if it is shown that there was a reasonable cause for such portion and

that the taxpayer acted in good faith with respect to such portion."  Sec. 6664(c).

**[*52]** Good-faith reliance on professional advice may provide a basis for a reasonable cause defense. However, certain opinions may not be relied upon. A tax adviser who "is a material advisor (within the meaning of section 6111(b)(1)), and participates in the organization, management, promotion, or sale of the transaction" may be a source of advice that may be relied upon to avoid the penalty for negligence. Sec. 6664(d)(4)(B)(i) and (ii). "The advice must be from competent and independent parties, not from promoters of the investment" or advisers who have a conflict of interest. Swanson v. Commissioner, T.C. Memo. 2009-31 (citing LaVerne v. Commissioner, 94 T.C. 637, 652-653 (1990), aff'd without published opinion, 956 F.2d 274 (9th Cir. 1992)); see Hansen v. Commissioner, 471 F.3d 1021, 1031 (9th Cir. 2006), aff'g T.C. Memo. 2004-269. "Courts have repeatedly held that it is unreasonable for a taxpayer to rely on a tax adviser actively involved in planning the transaction and tainted by an inherent conflict of interest". Canal Corp. v. Commissioner, 135 T.C. 199, 218 (2010); see also Pasternak v. Commissioner, 990 F.2d 893, 902-903 (6th Cir. 1993), aff'g Donahue v. Commissioner, T.C. Memo. 1991-181; LaVerne v. Commissioner, 94 T.C. at 652-653.

[*53] A promoter is "'an adviser who participated in structuring the transaction or is otherwise related to, has an interest in, or profits from the transaction'." 106 Ltd. v. Commissioner, 136 T.C. 67, 79 (2011) (quoting Tigers Eye Trading, LLC v. Commissioner, T.C. Memo. 2009-121), aff'd, 684 F.3d 84 (D.C. Cir. 2012). "A promoter's self interest makes 'advice' inherently unreliable." Tigers Eye Trading, LLC v. Commissioner, T.C. Memo. 2009-121.

In these cases, Messrs. Kritt and Reiserer cannot be relied upon for a good-faith reliance defense under section 6664(c). Messrs. Kritt and Reiserer planned, structured, and implemented every part of the OEL transaction. They were the owners of NESL and PLS, the domestic leasing agencies that employed Dr. Alexander during the transaction. Most importantly, they were paid only for implementing the plan and the continued participation in the plan. Messrs. Kritt and Reiserer received 4% of the money placed into a deferred compensation plan, and Dr. Alexander was aware that the more money he placed into the plan, the more money Messrs. Kritt and Reiserer would receive. Dr. Alexander also understood that the domestic leasing agencies used in the transaction were owned by Messrs. Kritt and Reiserer. The record shows that the tax advisers, Messrs. Kritt and Reiserer, were promoters of the OEL transaction. They implemented this type of transaction for numerous other medical professionals who were introduced

[*54] to it at medical conferences. There was a serious conflict of interest between the tax advisers and the Alexanders as the tax advisers' profit increased for every additional dollar placed into the transaction.

We conclude that Messrs. Kritt and Reiserer may not be relied upon for purposes of a reasonable cause defense under section 6664. Thus, the Alexanders have not met their burden of proving the section 6662(a) penalty is inappropriate.

C. Section 6651(f) Fraudulent Failure To File Addition to Tax for 2003

Section 6651(f) imposes an addition to tax of up to 75% of the amount of tax required to be shown on the return when the failure to file a Federal income tax return timely is due to fraud. In considering whether Dr. Alexander is subject to the addition to tax for fraudulent failure to file under section 6651(f) for 2003, we note that we have already determined the addition to tax for fraud under section 6663 is not applicable in the prior years. The Commissioner bears the burden of establishing fraud by "clear and convincing evidence." Sec. 7454(a); Rule 142(b); Korecky v. Commissioner, 781 F.2d 1566, 1568 (11th Cir. 1986), aff'g T.C. Memo. 1985-63; Clayton v. Commissioner, 102 T.C. 632, 653 (1994); Petzoldt v. Commissioner, 92 T.C. 661, 699 (1989).

We find no fraudulent intent in Dr. Alexander's failure to file a return for 2003 and the addition to tax under section 6651(f) is not sustained.

[*55] D. Section 6651(a)(2) and 6654 Additions to Tax for 2003

      1. Section 6651(a)(2)

Respondent determined that Dr. and Mrs. Alexander are liable for a section 6651(a)(2) addition to tax for the 2003 taxable year. Section 6651(a)(2) imposes an addition to tax for failure to pay the amount shown as tax on a return on or before the due date prescribed unless the taxpayer can establish such failure was due to reasonable cause and not willful neglect. The addition is equal to 0.5% of the amount shown as tax on the tax return but not paid, with an additional 0.5% each month or fraction thereof during which the failure to pay continues (up to a maximum of 25%). See Cabirac v. Commissioner, 120 T.C. 163, 170 n.12 (2003).

Section 7491(c) places the burden of production on the Commissioner to present sufficient evidence showing that the addition to tax is appropriate. Higbee v. Commissioner, 116 T.C. 438 (2001). Once the Commissioner meets this burden, the taxpayer has the burden of proof with respect to exculpatory factors, such as reasonable cause. Id. at 446.

In these cases, respondent has met his burden. Dr. Alexander did not file a tax return for 2003. His reasoning for not filing was a concern that filing any postchallenge return would be construed as either an admission or a continuation of the improper transaction. While this may have negated any fraudulent intent, it

**[*56]** is not a reasonable cause to not file a tax return. Dr. Alexander understood he had taxable income for 2003 and was informed by Mr. Kritt, the tax adviser he relied upon, that a tax return needed to be filed for 2003. Therefore, Dr. Alexander is liable for the section 6651(a)(2) addition to tax.

    2. <u>Section 6654</u>

Respondent also determined that Dr. and Mrs. Alexander are liable for an addition to tax under section 6654 for failure to pay estimated tax for 2003. Section 6654(a) imposes an addition to tax for failure to make timely and sufficient payments of estimated tax. A taxpayer has an obligation to pay estimated tax for a particular year only if he has a "required annual payment" for that year. Sec. 6654(d). A required annual payment is equal to the lesser of: (1) 90% of the tax shown on the taxpayer's return due for the year in issue (or, if no return is filed, 90% of the tax for such year); or (2) if the taxpayer filed a return for the immediately preceding taxable year, 100% of the tax shown on that return. Sec. 6654(d)(1)(B). Generally, section 6654 provides no exception for reasonable cause. Sec. 1.6654-1(a)(1), Income Tax Regs.; <u>see also</u> <u>Bray v. Commissioner</u>, T.C. Memo. 2008-113.

The Alexanders made no estimated tax payments for 2003, and therefore such payments were less than 90% of the amount of tax for that year  Additionally,

**[*57]** they do not meet any exceptions provided in section 6654(e). Therefore, the Alexanders are liable for the section 6654(a) addition to tax.

E. Section 6651(a)(1) Failure To File Addition to Tax for 2002 and 2003

As an alternative to section 6651(f), respondent contends that Dr. and Mrs. Alexander are liable for additions to tax pursuant to section 6651(a)(1) for 2002 and 2003. Section 6651(a)(1) provides for an addition to tax for failure to timely file a Federal income tax return (determined with regard to any extension of time for payment) unless the taxpayer shows that such failure was due to reasonable cause and not willful neglect. Mendes v. Commissioner, 121 T.C. 308, 320 (2003).

The Alexanders did not provide any reasonable cause for their tardiness for 2002. Therefore, we find they are liable for the section 6651(a)(1) addition to tax. For the same reasons we did not find any reasonable cause in the section 6651(a)(2) analysis, we do not find any reasonable cause under section 6651(a)(1). Therefore, Dr. and Mrs. Alexander are liable for the addition to tax pursuant to section 6651(a)(1) for 2003.

[*58] IV.  <u>Whether Mrs. Alexander Is Entitled to Innocent Spouse Relief Under
Section 6015</u>

Under section 6015(b), a requesting spouse may be relieved of joint and

several liability from an understatement of tax to the extent that the

understatement was attributable to the nonrequesting spouse.  To qualify for relief,

section 6015(b)(1) provides that the taxpayer must establish that

> (A)  a joint return has been made for a taxable year;

> (B)   on such return there is an understatement of tax attributable to erroneous items of 1 individual filing the joint return;

> (C)  the other individual filing the joint return establishes that in signing the return he or she did not know, and had no reason to know, that there was such understatement;

> (D)  taking into account all the facts and circumstances, it is inequitable to hold the other individual liable for the deficiency in tax for such taxable year attributable to such understatement; and

> (E)  the other individual elects (in such form as the Secretary may prescribe) the benefits of this subsection not later than the date which is 2 years after the date the Secretary has begun collection activities with respect to the individual making the election.

The requirements of section 6015(b)(1) are conjunctive, and therefore the

failure of a taxpayer to satisfy any one of the elements precludes relief.  <u>Haltom v.

Commissioner</u>, T.C. Memo. 2005-209.  Respondent concedes that Mrs. Alexander

satisfies the requirements of section 6015(b)(1)(A) and (E); however, respondent

[*59] maintains she failed to establish that she satisfies the requirements of section 6015(b)(1)(B), (C), and (D). Accordingly, the burden is on Mrs. Alexander to establish that she is entitled to relief.

Under section 6015(b)(1)(B), Mrs. Alexander is eligible for relief only if the understatement of tax is attributable to erroneous items of Dr. Alexander. We have already determined that the Schedule F farm losses are not deductible for 2001 and 2002. The disallowed losses and the resulting portion of each understatement are attributable to Mrs. Alexander. Mrs. Alexander was in charge of the farm business and reported the profits and losses to her husband for the purpose of filing the tax returns. We find that Mrs. Alexander is not entitled to relief for the portions of the 2001 and 2002 understatements attributable to the disallowed Schedule F losses because they are attributable to her. See sec. 6015(b)(1)(B).

Under section 6015(b)(1)(C), Mrs. Alexander is eligible for relief only if she did not know or have reason to know at the time she signed the joint return that there was an understatement of tax on the return. The Court of Appeals for the Sixth Circuit is the likely venue for any appeal of these cases. That Court of Appeals has held that knowledge of the transaction giving rise to the understatement will establish knowledge in an omitted income situation. In

[*60] Purcell v. Commissioner, 826 F.2d 470, 473-474 (6th Cir. 1987), aff'g 86 T.C. 228 (1986), the Court of Appeals held that knowledge of the transaction giving rise to omitted income was sufficient to bar relief under former section 6013(e). In Richardson v. Commissioner, 509 F.3d 736 (6th Cir. 2007), aff'g T.C. Memo. 2006-69, the Court of Appeals followed Purcell in a case where the taxpayer sought relief under section 6015(b) from a tax deficiency arising from the use of alleged trusts to shield income. The trusts in question were held to be a sham.

In Greer v. Commissioner, 595 F.3d 338, 345 (6th Cir. 2010), aff'g T.C. Memo. 2009-20, the Court of Appeals adopted the analysis of Price v. Commissioner, 887 F.2d 959, 965 (9th Cir. 1989), to analyze the reason to know requirement. In Price, the Court of Appeals for the Ninth Circuit explained that a test should be applied in "deduction" cases different from the test in "omissions-from-income" cases. Because the present cases involved omitted income, the knowledge of the transaction standard is appropriate. Mrs. Alexander clearly had knowledge of this transaction; but even if we applied the deduction standard of Price, Mrs. Alexander would not be eligible for innocent spouse relief. In Price and Greer, the Courts of Appeals held that "'[a] spouse has 'reason to know' of the substantial understatement if a reasonably prudent taxpayer in her position at the

[*61] time she signed the return could be expected to know that the return contained the substantial understatement'." Greer v. Commissioner, 595 F.3d at 346 (quoting Price v. Commissioner, 887 F.2d at 965). Mrs. Alexander is a very intelligent person who well knew the implications of the OEL transaction. She also knew about the methods to obtain cash for the family from the funds purportedly transferred to the control of the overseas entities.

We follow the law in the Sixth Circuit in applying the knowledge of the transaction test to omitted income situations. See Golsen v. Commissioner, 54 T.C. 742 (1970), aff'd, 445 F.2d 985 (10th Cir. 1971).

Mrs. Alexander attended the OEL seminar in the Bahamas where she and Dr. Alexander learned of the OEL transaction. She understood her husband would be working for a foreign entity as a result of the transaction and much of his money would be sent offshore. Mrs. Alexander also participated in the transaction through her role as trustee of the RAART Trust. We find that Mrs. Alexander had knowledge of the OEL transaction, and thus she is not entitled to relief from joint and several liability under section 6015(b) for deficiencies that arose from that transaction for 1999-2003.

The Alexanders also assert that it would be inequitable to deny Mrs. Alexander innocent spouse relief. Section 6015(f) provides an alternative means

**[*62]** of relief for a requesting spouse who does not otherwise qualify for relief under subsection (b) of section 6015. Sec. 6015(f)(2). Section 6015(f) permits relief from joint and several liability where "it is inequitable to hold the individual liable for any unpaid tax or any deficiency (or any portion of either)". Sec. 6015(f)(1). Under section 6015(f), the Secretary may grant equitable relief to a requesting spouse on the basis of the facts and circumstances of the requesting spouse's case. Except as otherwise provided in section 6015, the taxpayer bears the burden of proof. See Rule 142(a); Alt v. Commissioner, 119 T.C. 306, 311 (2002), aff'd, 101 Fed. Appx. 34 (6th Cir. 2004).

Pursuant to section 6015(f), the Commissioner has prescribed revenue procedure guidelines to help IRS employees determine whether a requesting spouse is entitled to relief from joint and several liability. See Rev. Proc. 2003-61, 2003-2 C.B. 296, modifying and superseding Rev. Proc. 2000-15, 2000-1 C.B. 447. Rev. Proc. 2003-61, supra, lists the factors that IRS employees should consider, and the Court considers those same factors when reviewing the IRS' denial of relief.[4] See Washington v. Commissioner, 120 T.C. 137, 147-152

---

[4]On January 5, 2012, the Commissioner issued Notice 2012-8, 2012-4 I.R.B. 3-9, announcing a proposed revenue procedure updating Rev. Proc. 2003-61, 2003-2 C.B. 296. That proposed revenue procedure, if finalized, will revise the factors that the IRS will use to evaluate requests for equitable relief under sec.

(continued...)

[*63] (2003). According to Rev. Proc. 2003-61, sec. 4.01, 2003-2 C.B. at 297-298, Mrs. Alexander, as a requesting spouse, must satisfy threshold conditions in order to be eligible to submit a request for equitable relief under section 6015(f).

Mrs. Alexander does not satisfy all of the threshold requirements for equitable relief under section 6015(f). Rev. Proc. 2003-61, sec. 4.01(5), requires that no disqualified assets have been transferred from Dr. Alexander to Mrs. Alexander. A "disqualified asset" means any property transferred to an individual making the election under section 6015(c) if the principal purpose of the transfer was the avoidance of tax or payment of tax. Sec. 6015(c)(4)(B)(i). Dr. Alexander's wages that were repatriated through the use of the OEL loans were transferred into RAART, Mrs. Alexander's trust. The assets were transferred in order to make capital improvements on the Alexanders' home and farm, and she well knew about the offshore transactions which generated the funds. Mrs.

---

⁴(...continued)
6015(f). In Sriram v. Commissioner, T.C. Memo. 2012-91, slip op. at 9 n.7, we stated that we would "continue to apply the factors in Rev. Proc. 2003-61, 2003-2 C.B. 296, in view of the fact that the proposed revenue procedure is not final and because the comment period under the notice only recently closed." See also Cutler v. Commissioner, T.C. Memo. 2013-119 (continuing to apply Rev. Proc. 2003-61, supra); Williamson v. Commissioner, T.C. Memo. 2013-78.

[*64] Alexander fails this prong of the analysis and thus is not eligible for relief under section 6015(f).

V. Fountain's Deficiencies

Respondent contends that Fountain has deficiencies for employment taxes for the years at issue. The deficiencies stem from the OEL transaction and the fact that Fountain did not treat Dr. Alexander as an employee for the years at issue.

    A. Dr. Alexander Was an Employee of Fountain During the OEL Transaction.

        1. Employment Status

Respondent had determined that Dr. Alexander was an employee of Fountain during the OEL transaction and Fountain is liable for employment taxes for the wages paid for Dr. Alexander's services. Paragraphs (1), (3), and (4) of section 3121(d) describe other individuals who are considered employees regardless of their status under the common law. Individuals described in those paragraphs are commonly referred to as "statutory" employees.[5] Joseph M. Grey Pub. Accountant, P.C. v. Commissioner, 119 T.C. 121, 126 (2002), aff'd, 93 Fed. Appx. 473 (3d Cir. 2004). One such category of statutory employees consists of

_____

[5]Under sec. 3121(d)(2), the term "employee" includes any individual who has the status of an employee under the common law. Because Dr. Alexander is a statutory employee, we do not find it necessary to discuss his status as a common law employee.

[*65] officers of corporations.  Sec. 3121(d)(1).  Section 31.3121(d)-1(b),

Employment Tax Regs., limits that category as follows:

> (b)  Corporate officers.--Generally, an officer of a corporation is an employee of the corporation.  However, an officer of a corporation who as such does not perform any services or performs only minor services and who neither receives nor is entitled to receive, directly or indirectly, any remuneration is considered not to be an employee of the corporation.  A director of a corporation in his capacity as such is not an employee of the corporation.

During the entire time the OEL transaction was in place Dr. Alexander was the sole officer at Fountain.  Dr. Alexander does not meet the exception provided in section 31.3121(d)-1(b), Employment Tax Regs., for officers who provide limited or no services to the corporation and receive no remuneration.  Dr. Alexander received remuneration for his services indirectly through NESL and PLS.  He exercised authority over the workplace, evidenced by his power to hire and fire employees.  He was also the sole practitioner working at Fountain and performed the essential service of the business.  During the periods in issue, Dr. Alexander was a statutory employee of Fountain because of his position as an officer who performed substantial services for the corporation.

Petitioners argue that Dr. Alexander and Fountain signed away Dr. Alexander's employee status by agreement and he had no employment contract with Fountain.  In Foxworthy v. Commissioner, T.C. Memo. 2009-203, aff'd per

**[\*66]** <u>curiam</u>, 494 Fed. Appx. 964 (11th Cir. 2012), we found that the leased employee in an OEL transaction was an employee of his own business rather than the leasing company and that the lease payments were his wage income.

Dr. Alexander is a statutory employee of Fountain; thus Fountain is liable for employment taxes for the wages that it paid for Dr. Alexander's services.  For the same reasons that the lease payments were income to Dr. Alexander, the lease payments are wages subject to employment taxes.

### 2. Relief Under Section 530

Petitioners argue that Fountain is entitled to treatment under section 530, which provides relief from employment tax liability.  Taxpayers are entitled to relief under section 530 if they demonstrate that:  (1) they did not treat an individual as an employee for employment tax purposes for any period, sec. 530(a)(1); (2) they filed all required Federal tax returns consistent with their treatment of the individual, <u>id.</u>; and (3) they had "a reasonable basis for not treating an individual as an employee", sec. 530(a)(2).  A taxpayer is deemed to have a reasonable basis if the taxpayer established its "treatment of such individual was in reasonable reliance on":  (1) judicial precedent, published rulings, technical advice with respect to the taxpayer, or a letter ruling to the

[*67] taxpayer; (2) a past IRS audit of the taxpayer in which there was no assessment attributable to the treatment (for employment tax purposes) of the individuals holding positions substantially similar to the position held by this individual; or (3) a longstanding recognized practice of a significant segment of the industry in which such individual was engaged. Id.

In addition to the safe harbors of section 530(a)(2), a taxpayer may demonstrate any other reasonable basis for the treatment of an employee for tax purposes. See, e.g., Springfield v. United States, 88 F.3d 750, 753 (9th Cir. 1996); Boles Trucking, Inc. v. United States, 77 F.3d 236, 239 (8th Cir. 1996). The legislative history reveals that the reasonable basis inquiry is to be liberally construed in favor of the taxpayer. See H. R. Rept. No. 95-1748, at 5 (1978), 1978-3 C.B. (Vol. 1) 629, 633. Section 530(e)(4), added by the Small Business Job Protection Act of 1996, Pub. L. No. 104-188, sec. 1122(a), 110 Stat. at 1766, places the burden of proof on the Secretary if the taxpayer establishes a prima facie case that it was reasonable not to treat an individual as an employee and the taxpayer has complied with the Secretary's reasonable requests for tax periods at issue.

We have already established that any reliance on advice from Messrs. Kritt and Reiserer was not reasonable. In addition, Dr. Alexander was treated as an

[*68] employee in all circumstances before the OEL transaction. The transaction created no changes in the business practices of SLAMD; and outside of Dr. and Mrs. Alexander, no other employee had any knowledge that SLAMD no longer considered Dr. Alexander an employee for employment tax purposes. Because there was no change in the way SLAMD and Dr. Alexander went about their day-to-day business, there is no reasonable basis for SLAMD to treat Dr. Alexander as anything but an employee for employment tax purposes. The transition from SLAMD to Fountain created no change in the way the business operated and provides no reasonable basis for Dr. Alexander to be treated as anything other than an employee. Additionally, the contracts between Dr. Alexander and the leasing agencies were not followed by the parties. Dr. Alexander worked at CVC without any agreement from any of the leasing agencies that had contracted for exclusive rights to his services. The disregard of the terms of the employment contracts show petitioners do not have a reasonable basis for believing Dr. Alexander was not an employee because of the contracts. As there is no reasonable basis for Dr. Alexander not to be treated as an employee, Fountain is not entitled to section 530 treatment.

[*69] B. <u>Fountain Is Liable for Employment Taxes With Respect to Dr. Alexander's Services During the Taxable Quarters Ended March 31, 1999, Through December 31, 2003</u>.

We have determined that Dr. Alexander was an employee of Fountain for all quarters from March 31, 1999, through December 31, 2003. Section 3101 imposes a tax on employees under the Federal Insurance Contributions Act (FICA) based on their wages paid, which the employer is required to collect under section 3102. The term "wages" as used in these statutes generally encompasses "all remuneration for employment". Secs. 3121(a), 3306(b). Fountain paid NESL and PLS as remuneration for Dr. Alexander's services. We have found that Dr. Alexander was in constructive receipt of all the funds paid for his services to NESL and PLS by Fountain. Because Dr. Alexander was an employee of Fountain and was in receipt of the funds paid as remuneration for his services, Fountain is liable for all employment taxes on the amounts paid for Dr. Alexander's services from March 1999 through December 31, 2003.

VI. <u>Fountain's Penalties and Additions to Tax</u>

A. <u>Fraud Penalty Under Section 6663</u>

Respondent determined that a fraud penalty was applicable to Fountain on the basis of the activity of Dr. Alexander, the sole shareholder, officer, and principal of Fountain. For the same reasons we did not find Dr. and Mrs.

[*70] Alexander liable for the fraud penalty under section 6663, we do not find Fountain liable for the fraud penalty.

B. Penalty Under Section 6662

Fountain has not paid employment taxes for Dr. Alexander's services for any of the quarters from March 31, 1999, through December 31, 2003.  Therefore during these periods there have been substantial understatements of more than 10% of the employment tax required to be paid.  For the same reasons discussed regarding Dr. and Mrs. Alexander, Fountain does not have a good-faith-reliance defense and is liable for penalties under section 6662.

C. Section 6656 Penalty

If a taxpayer is more than 15 days late in depositing employment taxes, section 6656 imposes a 10% penalty.  Sec. 6656; see also Ewens & Miller, Inc. v. Commissioner, 117 T.C. 263, 268 (2001).  The taxpayer is not liable for the section 6656 penalty if the late deposit was due to reasonable cause and not due to willful neglect.  Sec. 6656(a).

Fountain failed to make employment tax deposits for amounts paid for Dr. Alexander's services.  While reliance upon the advice of a professional can constitute reasonable cause, reliance on the professional's advice in good faith is

**[\*71]** required for the defense. Fountain is not entitled to this defense for the same reasons Dr. and Mrs. Alexander were not entitled to the section 6664 defense.

To reflect the foregoing,

<u>Decisions will be entered under Rule 155</u>.